## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

AARON DAVIS,

    Plaintiff,

    v.

JEFFREY NINES,
*Assistant Commissioner, West Region,*
KEITH ARNOLD, *Warden,*
BETHANY CORNACHIA, *Assistant Warden,*
RICHARD RODERICK,
*Case Management Supervisor,*
MICHELLE GARDNER,
*Americans with Disabilities Act Coordinator,*
UTILIZATION MANAGEMENT
MEDICAL DIRECTOR, YESCARE,
UTILIZATION MANAGEMENT
MEDICAL DIRECTOR, CENTURION,
KRISTINE M. SWICK,
*Assistant Director of Nursing,*
ASRESAHEGN GETACHEW, M.D., and
MICHAEL S. LOVE, *Charge Nurse,*

    Defendants.

Civil Action No. 24-2488-TDC

## MEMORANDUM OPINION

Self-represented Plaintiff Aaron Davis, a hearing-impaired inmate who is currently incarcerated at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed this civil rights action in which he asserts federal statutory claims and federal and state constitutional claims against correctional personnel and employees of the current and former contracted medical providers for Maryland state prisons, Centurion Health ("Centurion") and YesCare Corporation ("YesCare"), arising from Defendants' alleged failure to address and accommodate Davis's hearing impairment. In his verified Amended Complaint, Davis names 10

defendants in their individual and official capacities: former NBCI Warden and current Assistant Commissioner of Correction Jeffrey Nines, NBCI Warden Keith Arnold, NBCI Assistant Warden Bethany Cornachia, NBCI Case Management Supervisor Richard Roderick, Maryland Department of Public Safety and Correctional Services ("DPSCS") Americans with Disabilities Act Coordinator Michelle Gardner, the Utilization Management Medical Directors ("UMMDs") for YesCare and Centurion ("YesCare UMMD" and "Centurion UMMD"), YesCare Assistant Director of Nursing Kristine M. Swick, YesCare and Centurion Dr. Asresahegn Getachew, and Centurion Nurse Michael S. Love.

Defendants YesCare UMMD, Dr. Getachew, and Swick ("the YesCare Defendants") have filed an Amended Motion to Dismiss or, Alternatively, for Summary Judgment ("the YesCare Motion"); Defendants Centurion UMMD, Dr. Getachew, and Love ("the Centurion Defendants") have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("the Centurion Motion"); and Defendants Nines, Arnold, Cornachia, Roderick, and Gardner ("the State Defendants") have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("the State Defendants' Motion"). In responding to Defendants' Motions, Davis has filed a Motion to Clarify and Investigate, a Motion for Leave of Court to File an Appendix, and a Motion for Additional Time to Conduct Discovery. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the YesCare Motion will be GRANTED, the Centurion Motion will be GRANTED, the State Defendants' Motion will be GRANTED IN PART and DENIED IN PART, and Davis's Motions will be GRANTED.

## BACKGROUND

### I.     Davis's Allegations

In the presently operative Amended Complaint, Davis alleges the following relevant facts, which the Court accepts as true for purposes of the Motions.

Davis was diagnosed at birth with hearing loss which will become progressively worse over time and has relied on hearing aids throughout his life.  This disability affected his comprehension and motor skills as a child and has contributed to his various mental health conditions.  Davis asserts that deaf or hearing-impaired inmates need CapTel phones for communication with family and video relay phones with closed captions for use during visitation; mobile pagers or beepers to notify inmates of scheduled activities such as recreation, programs, meals, and medical passes; mounted alert beacons to notify inmates of shift changes and other announcements; and staff trained on the requirements and implementation of the Americans with Disabilities Act of 1990 ("ADA").  Davis contends that NBCI has failed to provide these accommodations or other effective ways for hearing-impaired inmates to utilize the prison's facilities.

Beginning on October 31, 2017, Davis was incarcerated at Maryland Correctional Institution–Jessup ("MCI-J"), a facility that "caters to deaf and hearing impaired inmates." Am. Compl. at 23, ECF No. 32.  On or about September 15, 2021, Davis was "arbitrarily" transferred to NBCI, a maximum security prison. *Id.* at 24.  Davis alleges that Warden Arnold, who was then the NBCI Assistant Warden with responsibility for ADA compliance, and NBCI Case Management Supervisor Roderick both knew or should have known that NBCI could not meet the needs of hearing-impaired inmates such as Davis.  He also alleges that Gardner, as the DPSCS ADA Coordinator, could have "facilitated a swap" of prisoners so that he could return to MCI-J,

and that the YesCare Defendants "may have been contacted" to advocate for such a transfer, but they did not do so. *Id.* at 24–25. According to Davis, since he has been held at NBCI, he has been deprived of equipment needed by hearing-impaired inmates for "daily aspects of prison life." *Id.* at 25.

On April 10, 2022, Davis filed an administrative remedy procedure grievance ("ARP"), No. NBCI-0634-22, in which he raised concerns about the accommodation of his hearing impairment. Although this ARP was dismissed, on appeal, the Commissioner of Correction found Davis's claim meritorious on August 4, 2022 and directed then-Warden Nines to adhere to ADA requirements.

On August 19, 2022, Davis sent a sick call request seeking a new hearing aid and other auxiliary equipment and requesting to see an audiologist. On August 20, 2022, Davis submitted a formal request for reasonable accommodations of his hearing impairment in which he sought, among other accommodations, the CapTel phone or video relay phone, a beacon or pager to alert him to events and emergencies, and a hearing-impaired sign to alert correctional officers that he cannot hear them.

On October 26, 2022, Davis met with Roderick to discuss his need for auxiliary aids. According to Davis, Roderick became "enflamed" and noted that Davis already had a hearing aid and a tablet for use in communications. *Id.* at 26. When Davis asked to be transferred back to MCI-J, Roderick told him that because he had a "poor adjustment history," he needed to reduce his security level and thus would need to "stay out of trouble for a year" in order to be considered. *Id.*; Information Report Form at 1, Am. Compl. Ex. 4, ECF No. 32-4. Later, in January 2023, a case manager told Davis that he would need to be infraction-free for three years to be considered for a decrease in security classification.

Meanwhile, on December 21, 2022, Davis was placed in administrative segregation through "no fault of his own." Am. Compl. at 26. Davis complained to an NBCI case manager about the hardships he faced while in segregation, but Roderick, who became Assistant Warden and the ADA Coordinator for NBCI in February 2023, responded that Davis had received a hearing aid and would have to make do with it because he would not be leaving NBCI. On February 15, 2023, Davis submitted an additional complaint requesting accommodations for his hearing impairment while in administrative segregation, such as the use of communication cards to inform him of his times for showers or recreation, because he could not hear announcements. That same day, Davis was returned to general population.

On March 19, 2023, after Davis tossed a bottle containing a cleaner to another inmate, Officers Kitzmiller, Kiefer, and Wagner strip-searched him, searched his cell, "vandalized" his property, and took away his hearing aid and hearing-impaired sign. *Id.* at 27. Davis was prevented from speaking to a supervisor about the incident and was told not to file a grievance. According to the investigative report attached to the Amended Complaint, the strip search was conducted because Davis had thrown a bottle through the security slot in his cell door toward another cell.

Around May 2, 2023, Davis received an order granting him single cell status, which he had been seeking since October 2021. On May 25, 2023, Dr. Ross Cushing, the audiologist, provided Davis with two hearing aids, one of which replaced the one taken during the strip search. During that visit, Dr. Cushing recommended that Davis receive a hearing-impaired sign to be placed outside his cell to inform correctional officers that he cannot hear, a beacon or pager to alert him to specific events such as meals and to emergencies, and access to the CapTel phone system. On June 14, 2023, Davis was moved to "a real medical cell." *Id.* at 28.

In a letter dated June 28, 2023, Swick reported that Davis's request for these accommodations had been denied. The letter stated that the hearing-impaired sign would not be provided because it violates Davis's medical privacy rights, that the beacon or pager is not available at NBCI, and that the CapTel phone system is not necessary because Davis had been seen using the regular phone. Swick noted that Davis could make and post his own sign, that he could return to a double cell in order to have a cellmate who could alert him to events and emergencies, and that if he wanted to use the CapTel system he would no longer be allowed to use the regular housing unit phones. The letter stated that despite Dr. Cushing's recommendation that the auxiliary aids be provided, the denials were the result of "safety and security" of the prison, and that the decisions were "handled through the Chief of Security." Swick Letter at 1, Am. Compl. Ex. 19, ECF No. 32-4.

On December 1, 2023, Davis sent a written request to Assistant Commissioner Nines and Warden Arnold in which he again requested a beacon or pager and the CapTel phone, but he did not receive any response. On December 2, 2023, two correctional officers conducted a search of Davis's cell during which they threw items of personal property into the toilet, including his hearing aid, which was rendered inoperable.

On January 11, 2024, in response to another request for accommodations, Warden Arnold noted that Davis was in administrative segregation pending adjustment because he had filed a request slip stating that he would hurt a cellmate if they housed him with one, which, according to Davis, "twist[ed] the safety concerns and the relative fear of [Davis's] life, liberty or health." Am. Compl. at 29.

On March 14, 2024, Dr. Getachew provided a medical report stating that Davis should receive a sign on the door of his single cell noting that he has a hearing impairment. According to

Davis, however, around April 2024, Swick continued to deny him the requested medical equipment by claiming that the YesCare UMMD had not approved it.

In July 2024, Assistant Warden Cornachia introduced herself to Davis and was aware of his needs relating to his hearing impairment. At a November 4, 2024 ADA meeting, however, Assistant Warden Cornachia asserted that NBCI was in compliance with the ADA even though Davis did not have access to the CapTel phone.

On January 24, 2025, Davis made another formal request for the same or similar accommodations sought through his August 2022 formal request. The same day, Davis also requested a replacement "disability card." *Id.* at 30. In a January 30, 2025 response, Davis was denied all auxiliary aids, including the CapTel phone, the pager, and a single cell because Warden Arnold and Assistant Warden Cornachia wanted to approve and designate medical cells themselves. On March 25, 2025, Davis was offered a cellmate, but he declined because he did not want to impose his disability on someone else. Davis was moved to administrative segregation again in April 2025. On April 16, 2025, Love responded to a request from Davis for single cell status by stating that the medical unit does not assign housing locations, including single cell status, and that he should make the request to custody officials.

## II.    Procedural History

On August 26, 2024, Davis filed the original Complaint in this case. In the presently operative Amended Complaint, he alleges seven claims against Defendants in the following numbered counts: (1) violations of the ADA, 42 U.S.C. §§ 12101–12213, and the Rehabilitation Act of 1973, 29 U.S.C. § 794; (2) a claim under 42 U.S.C. § 1983 ("§ 1983") for retaliation, in violation of the First Amendment to the United States Constitution; (3) a § 1983 claim for deprivation of life, liberty, or property, in violation of the Due Process Clause of the Fifth

Amendment to the Constitution; (4) a § 1983 claim for cruel and unusual punishment, in violation of the Eighth Amendment to the Constitution; (5) a § 1983 claim for deprivations of the rights to due process of law and equal protection of the law, in violation of the Fourteenth Amendment to the Constitution; (6) conspiracy to interfere with rights protected by the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1985(3); and (7) violations of Articles 16, 24, and 25 of the Maryland Declaration of Rights. He seeks compensatory and punitive damages, declaratory relief, and injunctive relief permitting him to use a CapTel phone and video relay phone, permitting him to carry a pager to alert him to meals, recreation, showers, and other events, transferring him to MCI-J or an equivalent prison to meet his needs under the ADA, and protecting him from retaliation.

## DISCUSSION

In their Motions, the State Defendants, the YesCare Defendants, and the Centurion Defendants all seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, summary judgment under Rule 56. In opposing the Motions, Davis has filed a Motion for Additional Time to Conduct Discovery ("the Motion for Discovery"). Davis has also filed a Motion to Clarify and Investigate, which seeks confirmation that the Court received his Amended Complaint and clarification on whether the new defendants listed in that pleading are now properly parties to this case, which will be granted because the Amended Complaint was received and the docket will be updated to identify only the defendants named in that pleading who remain in the case. The Court will also grant Davis's Motion for Leave of Court to File an Appendix consisting of additional documents in support of his Motion for Discovery.

## I.    Motion for Discovery

Defendants have titled their motions as Motions to Dismiss or, in the Alternative, Motions for Summary Judgment.  Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d).  Here, Defendants have all attached various declarations and exhibits with their Motions.  Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*  "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirements have been satisfied by the titles of Defendants' Motions.  To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002).

In this instance, Davis has included a Rule 56(d) request for discovery in his Amended Complaint and has filed a separate Motion for Discovery in which he argues pursuant to Rule 56(d) that he requires discovery before any motion for summary judgment should be considered. Generally, "summary judgment should only be granted 'after adequate time for discovery.'"

*McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, Rule 56(d) motions should be granted "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Id.* at 483–84 (quoting *Harrods Ltd.*, 302 F.3d at 244). Such motions are "broadly favored" and should be "liberally granted," especially "in the context of pro se litigation" and when the party seeking summary judgment "controls evidence relevant to the nonmovant's opposition." *Jenkins v. Woodard*, 109 F.4th 242, 251 (4th Cir. 2024) (citation omitted). "The threshold showing to support a Rule 56(d) motion is low," and the party seeking discovery before summary judgment need only "adequately inform[] the district court that the motion is pre-mature and that more discovery is necessary." *Escobar-Salmeron v. Moyer*, 150 F.4th 360, 369–70 (4th Cir. 2025) (quoting *Harrods Ltd.*, 302 F.3d at 244).

Upon review, Davis has sufficiently asserted that discovery is needed before the Court considers a motion for summary judgment. At this point, Davis has had no opportunity for discovery, and there are factual issues, including as to intent and state of mind, that remain to be resolved. *See Harrods Ltd.*, 302 F.3d at 244 (noting that a Rule 56(d) affidavit is not necessary when the party opposing summary judgment bears no fault for its "little or no opportunity to conduct discovery, and when fact-intensive issues, such as intent, are involved"). For example, as to the ADA and Rehabilitation Act claims, the record is not clear on the severity of Davis's hearing loss, why the specific accommodations for hearing loss requested by Davis could not be provided, whether they were necessary to allow Davis to utilize the facility, and whether they were reasonable to require in the context of the operation of NBCI. As to the First Amendment claim, there remain factual questions on the actual reasons that the allegedly retaliatory actions were taken against Davis, including placing him in administrative segregation, conducting a strip search and

cell searches, and confiscating or damaging his hearing aid, and whether those actions were taken with retaliatory intent. There are also factual questions on whether particular Defendants had subjective knowledge of Davis's medical needs relating to his hearing loss, as required to demonstrate deliberate indifference to those needs. Accordingly, the Court finds that it is premature to grant summary judgment without any discovery, will thus consider Defendants' Motions only as Motions to Dismiss based on the Amended Complaint and its attachments, and will not consider the additional record evidence submitted.

## II.    Motions to Dismiss

In their Motion, the State Defendants seek dismissal on the grounds that (1) they are immune from claims against them in their official capacities under the Eleventh Amendment to the Constitution; (2) the allegations fail to allege personal participation by any individual State Defendant; (3) the Amended Complaint otherwise fails to state plausible claims for relief; and (4) the individual State Defendants are entitled to qualified immunity. In their Motions, the YesCare Defendants and the Centurion Defendants (collectively, "the Medical Defendants") argue that the Amended Complaint fails to state plausible claims against them.

### A.    Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* A court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson*

11

*Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). A self-represented party's complaint must be construed liberally. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, "liberal construction does not mean overlooking the pleading requirements under the Federal Rules of Civil Procedure." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020).

### B.    Eleventh Amendment Immunity

The State Defendants first argue that they are immune from any claims against them in their official capacities pursuant to the Eleventh Amendment, under which, absent consent, a State, its agencies, and departments are immune from suits in federal court brought by their citizens or the citizens of another state. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state officials in their official capacities are claims against the State itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). There are, however, three exceptions to the Eleventh Amendment's prohibition of a suit against a State:

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

*Lee-Thomas v. Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 249 (4th Cir. 2012) (internal citations omitted). The second exception, derived from *Ex Parte Young*, 209 U.S. 123, 159–60 (1908), is relevant here. Under that exception, a plaintiff may advance a claim in federal court against a State to enjoin the State and its officials from "engaging in future conduct that would violate the Constitution or a federal statute." *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 163 (4th Cir. 2023) (quoting *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002)). The exception applies when the "complaint alleges an ongoing violation of federal law and seeks relief properly

12

characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment))).

Here, the Amended Complaint includes a request for injunctive relief requiring Defendants to provide Davis with certain accommodations for his hearing loss while he is incarcerated. Thus, while the Court will grant the Motion and dismiss the claims for damages against the State Defendants in their official capacities, it will deny the Motion as to the claims for prospective injunctive relief.

### C.     ADA and Rehabilitation Act

The State Defendants also argue that the ADA and Rehabilitation Act claims in Count 1 should be dismissed for failure to state a claim. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As relevant here, the ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of . . . communication . . . barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). The ADA defines "public entity" as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1)(A)–(B). Therefore, Title II of the ADA applies to state prisons. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (stating that "[s]tate prisons fall squarely within the statutory definition of 'public entity[]'"). Section 504 of

the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

Although the ADA applies to a "public entity," and the Rehabilitation Act applies to a "program or activity receiving Federal financial assistance," the elements of the causes of action are otherwise effectively the same. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 & n.17 (4th Cir. 2005). To establish a violation of Title II of the ADA or Section 504 of the Rehabilitation Act, plaintiffs must show that: (1) they have a disability; (2) they were otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such a service, program, or activity, or otherwise discriminated against, on the basis of their disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502–03 (4th Cir. 2016) (citing *Constantine*, 411 F.3d at 498). Title II, through its implementing regulations, requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *Lamone*, 813 F.3d at 504, 507 n.10. Title II also requires that public entities must "take appropriate steps to ensure that communications with [disabled persons] are as effective as communications with others" and must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program or activity of a public entity." 28 C.F.R. § 35.160(a)(1), (b)(1); *Lamone*, 813 F.3d at 505 n.7.

Here, Davis has sufficiently alleged facts demonstrating that he has a disability, specifically hearing loss, and that with auxiliary aids he can receive the full services of the prison, such that he is qualified to receive those services. He has also alleged that without such auxiliary aids, he is effectively denied certain services. For example, he alleges that without access to a CapTel phone, he cannot have full phone conversations with family members; without a video relay phone, he cannot have full conversations with visitors; and without a beacon or pager, he misses announcements that in turn cause him to miss showers, meals, and recreation. Whether the denial of these aids constitutes discrimination depends on whether their provision is necessary to ensure that Davis is not excluded from prison services, 28 C.F.R. § 35.160(b)(7)(i), and, if viewed as modifications to prison polices, practices, or procedures, depends on whether the requested modification is reasonable, would not cause "undue hardship," and would not "fundamentally alter the nature" of such services. *Lamone*, 813 F.3d at 507 & n.10; 28 C.F.R. § 35.130(b)(7)(i). The resolution of these issues, however, requires an assessment of a factual record that has not yet been fully developed. It depends on factual determinations of the severity of Davis's hearing loss, whether these particular aids will provide the necessary assistance, the adequacy of the existing auxiliary aids already available in the prison, and whether it is reasonable, in light of the prison's resources and penological requirements, to require that these additional aids be provided to Davis. Thus, while the State Defendants claim that the requested aids are not necessary because only "reasonable accommodations that ensure effective communication" are required, not "the most sophisticated or preferred auxiliary aids," State Defs.' Mot. at 17, ECF No. 50-1, it is premature to make the determination whether the requested accommodations are reasonable.

The additional arguments specific to the Rehabilitation Act claim also fail. Although the Rehabilitation Act requires a showing that defendants' discriminatory conduct, in this case, the

denial of the requested auxiliary aids, was "solely by reason" of the plaintiff's disability, where the auxiliary aids were requested specifically to address hearing loss, the allegations at this early stage are sufficient to meet this standard. *Constantine*, 411 F.3d at 498 n.17. Further, where the State Defendants acknowledge that Davis has alleged that the prison received federal financial assistance, it is premature to dismiss that claim before that factual issue is resolved. *See* State Defs.' Mot. at 18. Accordingly, the Court finds that Davis has stated viable ADA and Rehabilitation Act claims.

However, such claims must be asserted against the relevant public entity or entity receiving federal financial assistance, not individual personnel of such an entity. 42 U.S.C. § 12131(1); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471 (4th Cir. 1999) (upholding the dismissal of ADA claims against individuals because Title II recognizes a cause of action only against public entities, not individuals); *see also Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (joining the Fifth, Eighth, and Eleventh Circuits in holding that a plaintiff cannot use § 1983 to assert a claim against State officials in their individual capacities to vindicate the rights created by Title II of the ADA or Section 504 of the Rehabilitation Act).

Because the entity that failed to provide the requested auxiliary aids or accommodations is NBCI, these claims may proceed only against the State Defendants in their official capacities. *See Will*, 491 U.S. at 71. The ADA and Rehabilitation Act claims against the State Defendants in their individual capacities will therefore be dismissed. Likewise, the ADA and Rehabilitation Act claims against the Medical Defendants will be dismissed, both because they are not the public entities who failed to provide the requested auxiliary aids, and because, as discussed below in relation to the Eighth Amendment claim, the allegations are insufficient to demonstrate that they are responsible for the failure to provide those aids. *See infra* part II.D.2.

### D.   Eighth Amendment

The State Defendants also seek dismissal of Davis's Eighth Amendment claim in Count 4 for cruel and unusual punishment. In Count 7, Davis asserts violations of Articles 16 and 25 of the Maryland Declaration of Rights, which protect against cruel and unusual punishments. Md. Const. Decl. of Rts. arts. 16, 25. The Maryland Supreme Court has "consistently" interpreted Articles 16 and 25 as coextensive with the Eighth Amendment. *Evans v. State*, 914 A.2d 25, 67 (Md. 2006). Accordingly, the Court will treat the Eighth Amendment claim and the claims under Articles 16 and 25 together.

In the context of a failure to provide adequate care for a medical condition, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Such deliberate indifference requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure that the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious

medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* "Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.*

Davis's hearing impairment is plainly a serious medical condition that has and continues to require medical attention. As for the subjective component, whether a defendant has subjectively known of and disregarded "an excessive risk to inmate health or safety," *Jackson*, 775 F.3d at 178, the Amended Complaint does not allege inadequate medical care in relation to his hearing impairment; rather, it demonstrates that he has had regular access to Dr. Cushing, an audiologist, and there is no claim that there is any necessary medical procedure or treatment that has not been provided to him. The Eighth Amendment claim is therefore based on the failure to provide Davis with his requested auxiliary aids, specifically, access to a CapTel phone for outside phone calls, a video relay phone during visits, a beacon or pager to alert him to prison announcements, and a sign alerting correctional officers of his hearing impairment, or, in the alternative, to transfer him to MCI-J where he could receive these services.

### 1.    State Defendants

The State Defendants argue that such claims, which challenge the "adequacy or timeliness of accommodations," "may implicate the ADA or Rehabilitation Act but do not state an Eighth Amendment violation." State Defs.' Mot. at 13. However, the United States Court of Appeals for

the Fourth Circuit has recognized that the failure to accommodate a prisoner's disability, including a hearing impairment, can violate the Eighth Amendment in certain circumstances, such as where the failure to provide accommodations endangers the prisoner's health or safety. *See, e.g., LaFaut v. Smith*, 834 F.2d 389, 392–94 (4th Cir. 1987) (holding that the failure to provide a disabled prisoner with accessible toilets violates the Eighth Amendment); *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) (stating that "the failure to provide a wheelchair for an inmate may constitute deliberate indifference to a serious medical need"); *Large v. Washington Cnty. Det. Ctr.*, 915 F.2d 1564, No. 90-6610, 1990 WL 153978, at *1–2 (4th Cir. Oct. 16, 1990) (unpublished table decision) (holding that where "the failure to provide comparable basic corrective/medical devices may amount to deliberate indifference to a serious medical need," "under appropriate circumstances the refusal to supply a hearing aid to a convict could constitute deliberate indifference to a serious medical need"). In the analogous context of a civil detainee who brought a deliberate indifference claim under the Due Process Clause, the Fourth Circuit applied Eighth Amendment jurisprudence and found that "the absence of [American Sign Language] interpreters during medical interactions exposed [the prisoner] to a substantial risk of serious harm." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 211 (4th Cir. 2017). Although some of the requested aids may have related only to Davis's quality of life and not to his health and safety, viewing the allegations in the light most favorable to Davis, the Court cannot find at this early stage prior to any factual development that, for example, the requested beacon or pager, which would alert Davis to any prison emergencies, was not necessary for his health and safety.

As to the State Defendants, the Amended Complaint provides sufficient allegations to demonstrate that the State Defendants were aware of Davis's needs as a hearing-impaired inmate, primarily based on the numerous requests for the auxiliary aids that he submitted. They were also

19

aware that Dr. Cushing, the audiologist, had recommended these aids. The State Defendants assert that the decisions regarding Davis's accommodation requests "were not made by any one State Defendant acting unilaterally, but rather by committees of staff acting in their official capacities as part of a structured institutional review process." State Defs.' Mot. at 13. This assertion, even if true, does not demonstrate that no defendant involved in that process was deliberately indifferent to a serious medical need. Although § 1983 liability requires either personal participation or that the requirements for supervisory liability be established, the Amended Complaint contains allegations that Davis specifically discussed his need for auxiliary aids with Roderick in October 2022, that a prisoner rights organization contacted Gardner about his request for such aids in approximately June 2023, that he sent written requests for these aids to Nines and Arnold in December 2023, and that Cornachia denied his request for auxiliary aids in November 2024. Where the Amended Complaint alleges that each of the State Defendants was aware of Davis's requests, and where additional factual development is necessary to determine specifically who participated in the decision to deny the requests and the reasons for the denial, the Court will not dismiss the Eighth Amendment or Articles 16 and 25 claims as to any particular State Defendant.

### 2.    Medical Defendants

As for the Medical Defendants, the allegations are insufficient to state an Eighth Amendment claim. Davis pleads no facts showing that any of the Medical Defendants had the authority or ability to provide Davis with any of the requested auxiliary aids, or to require a transfer to another facility. To the extent that Davis might be able to assert an Eighth Amendment claim based on a failure to recommend such action, the Amended Complaint alleges that Dr. Cushing, the appropriate medical specialist, recommended these aids, and it provides no basis to conclude that the State Defendants who denied the aids relied upon any recommendation from any of the

Medical Defendants that the aids should not be provided. The broad allegation that the Medical Defendants should have "pressure[d]" the State Defendants to transfer Davis to MCI-J is insufficient to demonstrate deliberate indifference by the Medical Defendants. Am. Compl. at 25.

As for the specific Medical Defendants, there are no allegations showing that Dr. Getachew provided any recommendation contrary to that of Dr. Cushing. Rather, the Amended Complaint acknowledges that Dr. Getachew actually recommended that the hearing-impaired sign be provided.

The only allegation against Love is that he sent a letter to Davis in April 2025 informing him that the medical personnel at NBCI did not have the authority to assign him to a single cell and that he should direct the request to custody personnel. This letter is insufficient to demonstrate that Love acted with deliberate indifference to a known health and safety risk, particularly where the Amended Complaint does not provide a basis to show that the failure to provide a single cell would present an excessive risk to Davis's health and safety.

As for Swick, although Davis generally claims that she denied his requests for auxiliary aids, the only specific facts he provides on this issue are contained in a June 28, 2023 letter on DPSCS letterhead in which Swick acknowledges that Dr. Cushing had recommended the auxiliary aids but states that such matters "are all discussed and handled through the Chief of Security." Swick Letter at 1. Moreover, although Swick reported that the requests were denied, she did not state that no accommodations would be provided but instead stated that Davis could make his own hearing-impaired sign and that he could have a cellmate to assist in alerting him to prison announcements, and she appeared to state that he could have access to a CapTel phone if he would forgo the use of regular phones. Where there are no plausible allegations that Swick, as opposed to the Chief of Security, had the authority to make the decisions relating to the provision of

auxiliary aids, and where she proposed alternative means to meet Davis's needs, the Court finds that the allegations against Swick do not support the conclusion that she acted with deliberate indifference to Davis's medical needs.

Finally, as to the YesCare UMMD and the Centurion UMMD, there are no allegations that either had any role relating to this issue other than a general assertion that Swick at one point stated that the YesCare UMMD had not approved the auxiliary aids. Again, Swick's letter on this issue, referenced by Davis, did not invoke the YesCare UMMD, referred only to Dr. Cushing's recommendation in favor of the aids, and stated that the auxiliary aids were denied by the Chief of Security. Where the allegations demonstrate that State Defendants, not the Medical Defendants, had the authority to make decisions relating to the provision of auxiliary aids, the audiologist actually recommended the aids, and there are no allegations showing that the State Defendants relied on any medical recommendation in denying the aids, the Court finds that Davis has not stated a plausible Eighth Amendment claim against the Medical Defendants. Therefore, their Motions will be granted as to Davis's Eighth Amendment and Articles 16 and 25 claims against them.

### E.    First Amendment Retaliation

As for Davis's First Amendment retaliation claim in Count 2, "[t]he First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). An inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017). In order to establish a retaliation claim for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant

22

took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017); *Constantine*, 411 F.3d at 499. Generally, the filing of a prison grievance constitutes protected activity. *See Booker*, 855 F.3d at 545; *Savoy v. Bishop*, 706 F. App'x 786, 789 (4th Cir. 2017) (in addressing a grievance alleging an ADA violation, stating that the filing of a prison grievance is constitutionally protected activity).

Here, Davis has alleged that he filed complaints or grievances about the failure to provide the requested auxiliary aids on multiple occasions, and that following those complaints, he was subjected to adverse actions. For example, on August 20, 2022, Davis submitted a formal request for reasonable accommodations of his hearing impairment in which he sought the auxiliary aids discussed above. According to Davis, at an October 26, 2022 meeting to discuss the issue, Roderick became "enflamed." Am. Compl. at 26. Then, on December 21, 2022, Davis was placed in administrative segregation through "no fault of his own." *Id.*

In another episode, on February 15, 2023, Davis submitted an additional complaint about accommodations for his hearing impairment while in administrative segregation. Then, on March 19, 2023, after Davis tossed a bottle containing a cleaner to another inmate, Officers Kitzmiller, Kiefer, and Wagner strip-searched him, searched his cell, "vandalized" his property, and took away his hearing aid and hearing-impaired sign. *Id.* at 27. Davis was prevented from speaking to a supervisor about the incident and was told not to file a grievance. Even if some action by correctional officers was warranted, it is not apparent, at this early stage, whether the strip search was warranted, or why removal of Davis's hearing aid and sign was necessary.

In a third episode, on December 1, 2023, Davis sent a written request to Assistant Commissioner Nines and Warden Arnold in which he again sought a beacon or pager and the

CapTel phone, but he did not receive any response. The next day, on December 2, 2023, two correctional officers conducted a search of Davis's cell and put multiple items of his personal property into the toilet, including his hearing aid, which was rendered inoperable.

In each of these instances, Davis has alleged adverse actions taken against him following his complaints seeking the auxiliary aids as reasonable modifications or accommodations, in one case only one day after the incident. Although the adverse actions may prove to be unconnected to Davis's protected activity, and there may be legitimate reasons for those actions, when the allegations are viewed in the light most favorable to Davis as is required at this stage, and particularly where Davis has alleged facts that could support multiple instances of retaliation, the Court finds that he has adequately alleged a claim of First Amendment retaliation.

Where, however, the relevant allegations refer only to Nines, Arnold, and Roderick, but do not reference Cornachia or Gardner, the First Amendment claims against Cornachia and Gardner will be dismissed. Similarly, where the relevant allegations do not reference any of the Medical Defendants, any First Amendment claims against the YesCare Defendants or the Centurion Defendants will also be dismissed.

### F.   Due Process and Equal Protection

Defendants also seek dismissal of Davis's claims in Counts 3 and 5 under the Fifth and Fourteenth Amendments to the Constitution, which the Court construes as claims that the denial of the requested auxiliary aids violated his rights to due process of law and equal protection of the law. They also seek dismissal of the claim in Count 7 for a violation of Article 24 of the Maryland Declaration of Rights, which protects the right to due process. Md. Const. Decl. of Rts. art. 24. Because courts generally interpret Article 24 as coextensive with the Due Process Clause, the Court will analyze this claim together with the federal due process claim. *See Pitsenberger v.*

*Pitsenberger*, 410 A.2d 1052, 1056 (Md. 1980) (stating that "Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution have the same meaning").

In the Amended Complaint, Davis does not provide a basis to support a claim of a due process violation as he does not provide facts showing that he was deprived of a liberty or property interest without constitutionally required procedural safeguards, *see Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), and as necessary for a substantive due process claim, he has not articulated facts showing that the failure to provide the requested accommodations "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)).

As for the equal protection claim, the Equal Protection Clause of the Fourteenth Amendment generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To show that equal protection rights were violated, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). Upon such a showing, the court must "determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* at 731 (quoting *Morrison*, 239 F.3d at 654). Differential treatment based on a disability generally does not require heightened scrutiny. *See City of Cleburne*, 473 U.S. at 442, 443 n.10. Where the claim of differential treatment does not relate to a protected class subject to a higher level of scrutiny, such differential treatment is constitutional if the challenged policy serves a legitimate state interest and there is a rational basis for the policy. *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989). Here,

Davis has not stated a viable equal protection claim because he has not pleaded any facts showing that any of Defendants intentionally treated Davis differently than similarly situated inmates, such as any other inmates who may have requested and received other disability accommodations. He also has not provided allegations showing that Defendants intentionally barred him from any prison activities because of his disability. The Motions will therefore be granted as to the due process and equal protection claims in Counts 3, 5, and 7.

### G.    Civil Rights Conspiracy

In Count 6, Davis alleges a conspiracy claim under 42 U.S.C. § 1985(3), which creates a private cause of action against "two or more persons . . . [who] conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To state a claim under this provision, a plaintiff must allege the following:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

A Soc'y Without A Name v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011) (quoting Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995)). As discussed above in relation to the equal protection claim, Davis has failed to allege facts supporting the conclusion that there was unlawful discrimination or a violation of equal protection rights. For the same reasons, the Court finds that the Amended Complaint does not allege facts supporting a claim for a civil rights conspiracy under § 1985(3). The Motions will be granted as to this claim.

26

## H.    Qualified Immunity

Defendants also seek dismissal based on qualified immunity. Government officials sued in their individual capacities may invoke qualified immunity. *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013). "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999)). To overcome an assertion of qualified immunity from a § 1983 claim, a plaintiff must show that (1) the government official violated a federally protected right of the plaintiff; and (2) that right was clearly established at the time of the alleged misconduct, in that a "reasonable official would understand that what he is doing violates that right." *Id.*

The only remaining claims against certain Defendants in their individual capacities are the First Amendment retaliation claim in Count 2 and the Eighth Amendment claim in Count 4. Where the Court has found the allegations sufficient to state such claims as to certain State Defendants in their individual capacities, the remaining question is whether the rights at issue were clearly established at the time. During the relevant events in this case, it was clearly established that the First Amendment prohibits retaliation against a prisoner for filing a grievance. *Booker*, 855 F.3d at 545. In their Motion, the State Defendants do not discuss relevant case law and do not explain how this case may be distinguishable from that clearly established rule. Rather, they argue only that "reasonable officials in Defendants' position would have understood that reclassifying and transferring [Davis] based on his documented disciplinary history was lawful." State Defs.' Mot. at 21. Where the retaliation claim is not grounded solely on an allegedly improper transfer, and the factual reasons that such a transfer may have occurred remain in dispute, the Court does not

27

find that dismissal of the First Amendment claim based on qualified immunity is warranted at this early stage.

As for the Eighth Amendment claim, the State Defendants make no specific argument that the alleged misconduct, if proven, did not violate clearly established law. On its own review, the Court notes that the Fourth Circuit has found that the failure to accommodate an inmate's disability, including a hearing impairment, can sometimes constitute cruel and unusual punishment in violation of the Eighth Amendment. *See, e.g., Heyer*, 849 F.3d at 211; *Large*, 1990 WL 153978, at *2. The State Defendants have not identified any factual distinctions that would prevent a determination based on such case law that the right at issue was clearly established at the time of the relevant events, and even if they had, the Court would not be inclined to dismiss these claims on such a basis without first giving Davis the opportunity to have appointed counsel address such an argument. Moreover, where the facts remain unclear or in dispute, it is premature to conclude that the specific violation alleged by Davis does not fit within the contours of a violation of clearly established law. Thus, at this early stage of the case, the Court will not dismiss the Eighth Amendment claim based on qualified immunity.

### III.    Motion for Appointment of Counsel

In his Amended Complaint, Davis also requested appointment of counsel. There is no absolute right to appointment of counsel. *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). A federal district court, in its discretion, may appoint counsel in a civil case when an indigent party presents exceptional circumstances. 28 U.S.C. § 1915(e)(1); *see Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). Based upon a "fact specific, two-part inquiry," a court may find exceptional circumstances if it finds that (1) "the plaintiff has a colorable claim"; and (2)

"considering the claim's objective complexity and the plaintiff's subjective abilities," the plaintiff "lacks the capacity to present it." *Jenkins*, 109 F.4th at 247.

Here, as discussed above, Davis has stated viable claims. Where the next step in the case is discovery, the Court finds that as an incarcerated individual, Davis lacks the ability to litigate the case effectively going forward. Accordingly, the Court will grant the Motion and appoint counsel to represent Davis.

## CONCLUSION

For the foregoing reasons, the YesCare Defendants' Motion to Dismiss will be GRANTED as to all counts against them, the Centurion Defendants' Motion to Dismiss will be GRANTED as to all counts against them, and the State Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The State Defendants' Motion will be granted as to Counts 3, 5, and 6 and will be granted in part and denied in part as to Counts 1, 2, 4, and 7, as specified in the accompanying Order. Davis's Motion to Clarify and Investigate, Motion for Leave of Court to File an Appendix, Motion for Additional Time to Conduct Discovery, and Motion for Appointment of Counsel will be GRANTED. A separate Order shall issue.

Date: March 19, 2026

THEODORE D. CHUANG
United States District Judge

29